**RICHARD R. BEST**
**REGIONAL DIRECTOR**
**SANJAY WADHWA**
**WENDY B. TEPPERMAN**
**RICHARD HONG**
**ERIC C. KIRSCH**
**MICHAEL C. ELLIS**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**Brookfield Place**
**200 Vesey Street, Suite 400**
**New York, New York 10281-1022**
**(212) 336-0956 (Hong)**
**HongR@sec.gov**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | **COMPLAINT** |
| **Plaintiff,** | **20 Civ. _____ (    )** |
| -against- | |
| **DOUGLAS A. ROTH,** | **JURY TRIAL DEMANDED** |
| **Defendant.** | |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendant Douglas A. Roth ("Roth"), alleges as follows:

### SUMMARY

1.      This case involves unlawful insider trading in the securities of Aceto Corporation ("Aceto") by Roth, a former Chief Financial Officer ("CFO") of Aceto.

2.      In the first three months of 2018, Aceto's sales and earnings were declining, placing Aceto, a company involved in generic pharmaceutical business, in financial distress. As a result, Aceto had begun the process of testing the value of its intangible assets for a possible

impairment—a process that led to Aceto writing down the value of those assets by more than $235 million. Aceto also had initiated discussions with certain of its secured creditors, seeking to amend financial covenants that it had agreed to only months earlier but was in danger of violating, and it had begun considering discontinuing its dividend.

3.       Before retiring from Aceto on March 31, 2018, which was also the end date of Aceto's third fiscal quarter, Roth worked on each of these issues and received material, non-public information about them.

4.       After obtaining material, non-public information about these issues during his final months at Aceto, Roth sold, days after he retired, all of the Aceto shares that had vested upon his retirement. By knowingly or recklessly trading in violation of the duty of trust and confidence that he owed to Aceto and its shareholders, Roth avoided losses of more than $305,000.

## VIOLATIONS

5.       By virtue of the foregoing conduct and as alleged further herein, Roth has violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

6.       Unless Roth is restrained and enjoined, he will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

7.       The Commission brings this action pursuant to the authority conferred upon it by Exchange Act Sections 21(d) and 21A(a) [15 U.S.C. §§ 78u(d) and 78u-1(a)].

8.      The Commission seeks a final judgment: (a) permanently enjoining Roth from violating the federal securities laws and rules this Complaint alleges he has violated; (b) ordering Roth to pay civil money penalties pursuant to Exchange Act Sections 21A [15 U.S.C. § 78u-1]; (c) permanently prohibiting Roth from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and (d) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to Exchange Act Section 27 [15 U.S.C. § 78aa].

10.      Roth, directly and indirectly, has made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

11.      Venue lies in this District under Exchange Act Section 27 [15 U.S.C. § 78aa]. Roth may be found in, is an inhabitant of, or transacts business in the Eastern District of New York, and certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District. Roth is a resident of East Northport, New York. In addition, Roth worked at Aceto's headquarters in Port Washington, New York, where he obtained material, non-public information about Aceto.

## DEFENDANT

12.      **Roth**, age 63, is a resident of East Northport, New York. On October 26, 2017, Roth notified Aceto that he would be retiring as CFO of Aceto effective March 31, 2018, a

position he had held since May 2001.

<div align="center">

**OTHER RELEVANT ENTITY**

</div>

13.     **Aceto** was a New York corporation headquartered in Port Washington, New York. At all relevant times, Aceto was in the business of marketing and selling generic pharmaceuticals, pharmaceutical ingredients, and chemicals. At all relevant times, Aceto's common stock was registered pursuant to Section 12(b) of the Exchange Act and traded on the NASDAQ Global Select Market (ticker: ACET). On February 19, 2019, Aceto filed a petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey, which led to all of its operations being sold and the company being liquidated.

<div align="center">

**FACTS**

</div>

**A.     Roth Owed a Duty of Trust and Confidence to Aceto and its Shareholders**

14.     Roth owed a duty of trust and confidence to Aceto and its shareholders, and Aceto's policies expressly provided that Roth's duty prohibited him from trading Aceto securities while he was in possession of material, non-public information. From his nearly 17 years as Aceto's CFO, Roth was well familiar with such duties and policies.

15.     Aceto had both a Code of Business Conduct and Ethics (the "Code of Conduct") and a Corporate Trading Policy, which was incorporated by reference into the Code of Conduct. Both policies expressly prohibited all directors, officers, and employees of Aceto from trading in Aceto securities while in possession of material, non-public information about the company. Both policies provided that the prohibition continued after separation from Aceto until any material, non-public information known by the separating employee had become public or was no longer material.

16.     Aceto's Corporate Trading Policy warned of civil and criminal liability under the

<div align="center">

4

</div>

federal securities laws, and provided a non-exclusive, illustrative list of types of information that Aceto viewed as reasonably likely to be material. It included, among other things, earnings or expectations for the quarter or the year; internal information about revenues, earnings or other aspects of financial performance which departs in any way from what the market would expect based upon prior disclosures; major events regarding Aceto securities, such as a change in dividend policy; proposals, plans or agreements, even if preliminary in nature, for bank borrowings or other financing transactions outside of the ordinary course of business; and significant write-downs in assets.

17.     Aceto's Corporate Trading Policy also prohibited trading in Aceto securities during regular quarterly "Earnings Black-Out Periods." The Earnings Black-Out Period prohibition applied to all employees who were directly involved in the preparation of Aceto's consolidated quarterly financial statements or who had access to information from those financial statements while they were being prepared. They began on the 21st day before the end of a quarter and ended two trading days after earnings were released. An Earnings Black-Out Period was in effect from March 10, 2018 until May 9, 2018 in connection with the closing of Aceto's third fiscal quarter ending March 31, 2018. During his nearly 17 years as Aceto's CFO, Roth was routinely subject to Aceto's quarterly Earnings Black-Out Periods.

18.     Aceto's Corporate Trading Policy also prohibited trading in Aceto securities during "Non-Ordinary Black-Out Periods." Non-Ordinary Black-Out Periods were imposed by Aceto's Corporate Secretary on individuals who became aware of events, developments, contingencies, or potential transactions that constituted material, non-public information. Aceto's Corporate Trading Policy stated that the existence of a Non-Ordinary Black-Out Period itself could constitute material, non-public information. A Non-Ordinary Blackout Period

5

applicable to Roth was in effect at all relevant times. On March 29, 2018, two days before his retirement, Roth was reminded in a communication that this Non-Ordinary Blackout Period was still in effect.

19.     As recently as in the year prior to his retirement, Roth had executed a Code of Business Conduct and Ethics Acknowledgement of Receipt and Understanding Agreement to be Bound, dated March 1, 2017, in which he both acknowledged that he had received, read, and understood the Code of Conduct and agreed to be bound by the obligations set forth in the Code of Conduct, which incorporated the Corporate Trading Policy.

**B.     Roth Traded in Aceto Securities After Obtaining Material, Non-Public Information from Aceto**

20.     Although Aceto's Code of Conduct and Corporate Trading Policy required Roth to maintain the confidentiality of information that he learned in connection with his employment and to refrain from trading on the basis of such information, and although Roth was fully informed of these obligations and limitations, Roth nevertheless traded securities issued by Aceto after obtaining material, non-public information from Aceto.

21.     In 2016, Aceto borrowed funds under a Second Amended And Restated Credit Agreement, dated as of December 21, 2016 (the "Credit Agreement"), from creditors who were granted a security interest in substantially all of Aceto's assets (the "Secured Creditors"). The Credit Agreement contained three financial covenants, each of which required Aceto either to keep the ratio of a debt calculation to an earnings calculation below a certain level, or to keep the ratio of an earnings calculation to a debt service obligation calculation above a certain level (the "Financial Covenants"). Each of the three Financial Covenants could be violated if a drop in earnings pushed the relevant ratio past a certain point. A breach of any of the Financial Covenants constituted an event of default under the Credit Agreement.

22.     In November 2017, when Aceto projected that it risked breaching one of the Financial Covenants, it sought an amendment of the Financial Covenants that would bring Aceto back into compliance.  On December 13, 2017, the Secured Creditors agreed to amendments that eased the Financial Covenants for the three remaining fiscal quarters for Aceto's fiscal year ending June 30, 2018.  The amended agreement was announced in a Form 8-K filed with the Commission on December 18, 2017.

23.     On February 2, 2018, prior to market-open, Aceto filed a Form 10-Q (the "February Form 10-Q") and issued a press release, dated February 1, 2018, concerning its fiscal second quarter, ending on December 31, 2017.  Aceto reported a decline in profits and profit margins and projected that its generic pharmaceutical business would continue to face "generic industry headwinds."  Aceto projected that overall results for the second half of the fiscal year would be "only modestly better than the first half" and that it would have non-GAAP earnings of between $1 and $1.05 per share (the "February Guidance").

24.     In early February 2018, Roth presented a forecast to Aceto's board of directors projecting that if Aceto hit the mid-point of its February Guidance, it would breach one of the recently-revised Financial Covenants in each of the two quarters remaining in its fiscal year ending June 30, 2018.  It also projected that Aceto could avoid the breach by outperforming the forecast underpinning the February Guidance, repatriating cash held abroad to pay down debt, or obtaining a further amendment of the Financial Covenants.  However, Aceto's earnings further declined in February 2018.  By early March 2018—the start of the final month in Aceto's third fiscal quarter—Roth received updated internal forecasts projecting that Aceto would fall materially short of the February Guidance and breach two of the Financial Covenants in the current quarter, as well as in several subsequent quarters, even if it repatriated its cash held

7

overseas.

25.     Roth was involved in and knew about Aceto's projections about violations of the Financial Covenants because he and one of his subordinates prepared the projections, and Roth received copies of presentations reflecting those projections. In February 2018, Roth initiated discussions with the Secured Creditors, seeking an amendment or waiver of the Financial Covenants. In March 2018, Roth participated in the preparation of a presentation, which was sent to Aceto's senior management, proposing the discontinuation of its dividend as a potential way to mitigate the degree to which Aceto would be in violation of the Financial Covenants.

26.     Roth was aware, at the time he retired from Aceto on March 31, 2018, that Aceto had not obtained an amendment or waiver of the Financial Covenants, and there had been no positive developments that would have changed Aceto's projection that it would violate the Financial Covenants. For example, Roth knew that Aceto's sales and earnings continued to be short of the February Guidance because he received reports on Aceto's sales and earnings throughout the quarter that ended March 31, 2018. As such, Roth was aware not only that Aceto would not meet its February Guidance for earnings, but also that Aceto would be in breach of the Financial Covenants unless it received a waiver or further amendment, which had not yet occurred.

27.     By early March 2018, Aceto's known results and projected earnings had declined to the point that Aceto also began testing the intangible assets on its balance sheet to determine if the decline in earnings would require Aceto to take an impairment charge, which would write down part of their value. During March 2018, Aceto's projections and testing revealed that, at the low end, Aceto would be required to write down the value of its intangible assets by at least $135 million and that, at the high end, the approximately $235 million of goodwill on Aceto's

balance sheet might be fully impaired—that is, its value would be reduced to zero. At either the high or low end of the impairment testing results, the write down would comprise a significant portion (from approximately 13.5% to 23.5%) of Aceto's total assets, which were approximately $1.01 billion as of December 31, 2017.

28.     Roth was also directly involved in the impairment assessment and testing process. Among other things, he participated in the identification of the possible impairment charge and received updates by email containing estimates of possible impairment charges, all of which estimated that an impairment charge would exceed $100 million.  Some of the updates indicated all $235 million of goodwill on Aceto's balance sheet could be impaired.  Even the lowest of these estimated impairment charges was material to Aceto, which had approximately $1.01 billion of assets on its balance sheet before the impairment.

29.     When Roth's retirement became effective on Saturday, March 31, 2018, he became vested in 69,549 Aceto shares that he had received as equity compensation.

30.     During his final week at Aceto, Roth contacted the broker for Aceto's equity compensation program and informed him that he was considering selling all 69,549 shares that would vest upon his retirement.

31.     Before placing an order to sell the shares, Roth provided an executed Form 144 to his broker covering all 69,549 shares, which included a representation that Roth "d[id] not know any material adverse information in regard to the current and prospective operations of the Issuer of the securities to be sold and which has not been publicly disclosed."

32.     On April 3, 2018, the second business day after his retirement became effective, Roth contacted the broker for Aceto's equity compensation program and confirmed that he wished to sell all 69,549 shares, and Roth placed limit orders.  The sales were executed over the

course of two days, with Roth selling 34,744 Aceto shares on April 3, 2018 and 34,805 Aceto shares on April 4, 2018.

33.     Roth traded in Aceto securities in breach of his obligations under Aceto's policies and in breach of his duty of trust and confidence to Aceto and its shareholders.  Roth knew or recklessly disregarded that he breached these duties by trading while in possession of material, non-public information regarding Aceto.

34.     Roth traded in Aceto securities on the basis of the information that he obtained while working at Aceto and while knowing, or while reckless in not knowing, that the information he obtained through his position was material and nonpublic.

35.     Roth's trading on the basis of material, non-public information entrusted to him by Aceto and its shareholders was deceptive and fraudulent.

**C.     Aceto's Announcement**

36.     After the markets closed on April 18, 2018, Aceto filed a Form 8-K and issued a press release announcing that (a) it anticipated recording non-cash intangible asset impairment charges, including goodwill, in the range of $230 million to $260 million to be recorded in the fiscal third quarter ended March 31, 2018; (b) it was negotiating a waiver of the Financial Covenants for the fiscal third quarter; (c) it anticipated a significant reduction of its dividend to provide appropriate assurances to its lenders and to fortify the balance sheet; (d) its February 1, 2018 financial guidance should no longer be relied upon, and it was suspending providing further financial guidance; (e) its board of directors had initiated a process to identify and evaluate a range of strategic alternatives; and (f) Roth's successor as CFO had resigned, two months after being hired.

37.     On April 18, 2018, before Aceto issued its Form 8-K and press release, Aceto's

stock closed at $7.40.  On April 19, 2018, Aceto's stock closed at $2.66, a decline of approximately 64 percent.  Aceto's stock price was still below $3 when Aceto released its results for its fiscal third quarter on May 7, 2018, when it reported an impairment of more than $256 million and a loss of more than $202 million for the nine month period ended March 31, 2018.

38.     By selling his Aceto shares on April 3 and 4, 2018, in violation of the duty of trust and confidence that he owed to Aceto and its shareholders, Roth avoided losses of more than $305,000.

<div align="center">

**CLAIM FOR RELIEF**
**Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**

</div>

39.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 38.

40.     Roth, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly has (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

41.     By reason of the foregoing, Roth, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final

Judgment:

## I.

Permanently enjoining Roth and its agents, servants, employees and attorneys and all

persons in active concert or participation with any of them from violating, directly or indirectly,

Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R.

§ 240.10b-5];

## II.

Ordering Roth to pay civil monetary penalties under Exchange Act Section 21A [15

U.S.C. § 78u-1];

## III.

Permanently prohibiting Roth from serving as an officer or director of any company that

has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is

required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to

Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and

**IV.**

Granting any other and further relief this Court may deem just and proper.


Dated: New York, New York
       November 5, 2020

<div style="margin-left:40%">

/s/ Richard R. Best
RICHARD R. BEST
REGIONAL DIRECTOR
Sanjay Wadhwa
Wendy B. Tepperman
Richard Hong
Eric C. Kirsch
Michael C. Ellis
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0956 (Hong)
HongR@sec.gov

</div>